All rise. Judges of the United States Court of Appeals for the Ninth Circuit, hear ye, hear ye. All persons having business with the Honorable United States Court of Appeals for the Ninth Circuit, give your attention, and you will be heard. God save the United States and this Honorable Court. You may be seated. Good morning, ladies and gentlemen. We're here for rehearing en banc in the case United States v. Briones. If I've mispronounced that, please correct me. You may proceed. May it please the Court, Isha Anand for Defendant Appellant Riley Briones, Jr. I'd like to reserve seven minutes for rebuttal. Montgomery squarely held that even if a court considers a child's age, a life-without-parole sentence still violates the Eighth Amendment for all but the rare juvenile offender whose crime reflects permanent incorrigibility. As Judge O'Scanlon explained, the district court here violated that express holding by sentencing Mr. Briones to life in prison, even though it found that Mr. Briones, quote, has improved himself while he's been in prison, even though the prosecution acknowledged that Mr. Briones has come a long way since his crime. On such a record, Montgomery permits only one conclusion, that life without parole is an unconstitutional sentence, because far from being so, quote, irretrievably depraved that rehabilitation is impossible, Mr. Briones has actually already undergone a dramatic transformation. Do you really think that it permits only one resolution? Yes, Your Honor. And that's because the question is not, is Mr. Briones 100 percent rehabilitated as he stands before you today? The question is, is he so irretrievably depraved that rehabilitation is impossible? And so in a case where the prosecution concedes he's come a long way, where the district court found that he had improved himself, where no one disputes he's been a model inmate and feels remorseful, it's certainly the case that rehabilitation is at least possible, even if it hasn't occurred yet. So can we make that determination, or must we remand for the district court to make that finding? So, Your Honor, we have two arguments before you. The first is that the district court did not, in fact, make that determination. So at the very least, the sentence must be vacated and the case remanded for the district court to apply the proper analysis. What is the requirement, though? The Supreme Court specifically said there was no requirement to basically say magic words. But on the other hand, there's the five-part test. The fourth and fifth parts were not really stated here. Is this like a 3553A analysis where the court has to consider it but doesn't necessarily need to say it? Or must there be an express, if you will, ticking off of the court's judgment about each of those five factors? So, Your Honor, there is no magic words requirement, as you put it. However, from what the district court said here, we know that the district court wasn't doing the right analysis. And so Judge O'Scanlan points to sort of a half-dozen indicators. The fact that the district court found Mr. Briones had improved himself, which ought to be all but dispositive, and the district court didn't seem to see it that way. The fact that the district court says, makes forward-looking statements about why life without parole is inappropriate, but doesn't have any forward-looking statements about why life without parole might be appropriate. The fact that the district court says some decisions have lifelong consequences, which we know from Graham and Miller, is simply not true for juveniles who commit crimes unless they're in this rare category. The fact that the district court began with the guidelines rather than beginning with the presumption that the life without parole sentence would be unconstitutional. You've told us why you don't think the court considered it, but turning it a little bit. Okay. If the court agrees with you, should we set forth in an opinion an express requirement that when you're dealing with someone who committed this kind of a crime when you're a minor, that the court must expressly consider and discuss each of these five elements mentioned in Miller? So, Your Honor, there has to be an indication that each of the Miller factors was considered. But more than that, there also has to be an indication that the animating principles, rarity, permanence, and incorrigibility, underlie the decision. So, incorrigibility, the focus has to be capacity for change. Permanence, the focus can't be at the time of the crime or even in the year or two after. It has to be in the decades to come. And rarity, so you start from the presumption life without parole is the wrong sentence. And then the kinds of evidence you use to find life without parole appropriate can't be evidence you could point to for any juvenile homicide offender. I looked for the words incorrigibility or irreparable corruption anywhere in the district court record or any argument that was made. And I didn't see those arguments being made. Judge O'Scanlan's dissent said they were and that that was the gist of his argument. But I didn't see that anywhere in the record. So, was that argument, specific argument, that he constitutionally could not be sentenced to life without parole? Was that expressly made to the district court? And if so, where? Yes, Your Honor. Now, I'll note that because the sentencing memorandum was drafted before Montgomery, those magic words, those precise words aren't used. But the transcript before the district court was after Montgomery, and I didn't see those words in the transcript. That's right. That's right? They weren't in the transcript? So, those precise words were not in the transcript. However, You can't file a 2255 motion based upon Miller without raising that central inquiry. How would he do that? That's the 2255 motion, right? That's correct. So at the point when he sought to vacate his sentence, Mr. Brionis drafted a pro se 2255 motion and argued that life without parole was unconstitutional for him under Miller. Under Miller. That's correct. And so during the district court's colloquy, for instance, counsel for Mr. Brionis says, starts by explaining that life should be uncommon. You don't start with life and work your way down. She's talking about rarity there. That's at ER 220. At ER 221, she says a life sentence would be unconstitutional in light of Graham and Miller. At ER 234, she explains that he's in the category of the transiently immature, says he was making bad choices because he was a teenager who didn't understand the risks and consequences. And then at ER 237, counsel concludes by saying we believe under Miller life is not the appropriate sentence here. Are you arguing today that the Court shouldn't have started with the guidelines calculation? So, Your Honor, our argument is that even if Gall mandates as a formal matter that the district court calculate the guidelines at the outset. And it does, right? Are we going to discuss that today? I'm really trying to figure out if that's your starting point. So we accept that that is the command of Gall. Thank you. But in cases like Molina-Martinez and Coons, the Supreme Court has explained that in some cases that may be a mere formality. So, for instance, in Coons. Well, it's a starting place, right? It's a starting place. After all, we're talking about where there's a mandatory ill bomb, right? Or in a 2255, a situation where the guidelines lead to life. That's what we're talking about here. And there isn't a – I don't hear any pushback from the State on the mandatory nature of the – quite the contrary, right? But that's the start – the beginning of the analysis, it seems to me. That is correct as a formal matter, but what Coons makes clear is in that case it was a statute, right? So the Supreme Court said you can calculate the guidelines, and then where a statute commands a different analysis, you can, district courts say, I'm ignoring the guidelines because I recognize that the statutory mandatory minimum is simply outside the guidelines range. And that's a totally acceptable – I'm sorry, Your Honor. That's all right. I think I interrupted you. Forgive me. But my question is, because I don't want you to take up too much of your time, you're not pushing back that it was correct to start with the guidelines, and that in this case that gets to basically an LWOP, right? And then I think your premise is the next question needs to be, or should be, but this is really a question, why is this the rare case? So I think the next question needs to be an acknowledgement, and again no magic words, that the guidelines are an inappropriate starting point in this case, just as they would be in a case like Coons where the statute commands a different analysis. Here the Constitution commands a different analysis. You start with the guidelines, and then we know, because the Supreme Court has told us, that it's going to be the rare case where that's going to work for a juvenile. That's correct. Okay. And I don't mean to just sort of split hairs with you. I want to make sure we're doing the decision tree the same way, and I think we are. Thank you. That's correct. So after calculating the guidelines, the Court, and again, Melina Martinez and Coons say there's a variety of ways you can indicate you're breaking free of the guidelines anchoring effect. You can say something like, but I recognize for most juveniles, the vast majority, this is going to be unconstitutional, so I have to do the constitutional inquiry. You can say the Constitution obviates that. You can say whatever you want, but you have to have some indication that that's not your starting point, because the Supreme Court tells us for the vast majority of juveniles that's an unconstitutional anchor point. May I change the subject a little and ask whether the recent cert grant in Malvo v. Mathena suggests that we should be holding this case rather than deciding it now? Your Honor, we believe that this case does not need to be held. So as we explained, the Malvo cert petition doesn't mention Brionis. And that's what the Malvo cert petition doesn't mention this case in describing the split. And so in listing all the cases that implicate the question in that case, Brionis is not among them. Yes, but it seems to me that your argument, at least at its strongest, depends on there being a strong substantive element to Montgomery. That's correct. And the argument, as I understand it, in Malvo is that Montgomery did not, essentially doesn't have that element when you're applying it to a discretionary decision. And what we have now here is a discretionary decision because the sentence has already been vacated, the LWOP. So we have the equivalent, don't we, of a discretionary decision whether to apply how to apply Montgomery. So although it's not in a direct line, it seems to be a very strong overlap. So, Your Honor, it's not for me to tell the Court how to manage its docket. But the reason I don't think that Malvo will have any bearing on this case is because the Malvo cert petition expressly says we're not asking the Court to overrule Montgomery, we're not asking the Court to turn a blind eye to large portions of it. All the petition is asking is which portions of Montgomery are retroactive. And in this procedural posture, that's no longer a salient question because we don't have a final sentence on the book. So, Mr. Brionis. So as I understand it in that case, the question is whether to resentence, and that resentencing was done in accordance with the permissible principles. That's exactly right, Your Honor. And so in this case, Mr. Brionis gets the benefit of all of Montgomery, no matter which pieces of it are retroactive, and that procedural difference means that Malvo is unlikely to have any effect on this case. But I thought the question in Malvo was how Montgomery applies to a discretionary decision. Retroactive or not? So in Malvo, the question is when you have a final sentence on the books that may or may not be discretionary in that case, which portions of Montgomery are retroactive so as to be able to dislodge that sentence or vacate it? And in this case, the sentence has already been vacated. So regardless of which portions of Montgomery are retroactive, that doesn't have any bearing on how the resentencing should proceed. Your Honor, I want to turn back to one of the government's main arguments for why this sentence is constitutional. They suggest that there should be an exclusive focus on the crime itself in determining permanent incorrigibility. And we know that can't be right for a couple of reasons. We know that from Montgomery itself. We know that from this Court's opinion in Pete. And we know that from some of the principles underlying the Court's Eighth Amendment jurisprudence. So in Montgomery itself, the Court closes with a paragraph about how Henry Montgomery has learned to silkscreen. He has joined an inmate boxing team. He's become a role model. And the Court explains that that's the sort of evidence that the State will have to test on remand. That's the sort of evidence that might demonstrate a capacity for rehabilitation. So in Montgomery itself, we see that evidence from far after the crime is relevant, if not dispositive. And then this Court explained in Pete that if you look at Pepper and Montgomery, since the critical Eighth Amendment question is capacity to change, evidence that someone has in fact changed is pretty key evidence on that point. And then finally, we know from Graham and Miller that the Supreme Court has really cautioned against a focus on the crime because, quote, the brutality or cold-blooded nature of the crime may overpower any mitigating argument based on youth, even where a juvenile offender's objective immaturity and lack of true depravity would counsel against a life sentence. And so the Supreme Court really cautions against focusing on the crime because it can be misleading in this setting. I also want to respond to the government's — to the government's contention that in this case there was a lack of responsibility that was taken. Now, again, the question before you is not should Mr. Briones be let out tomorrow. The question is not is he 100 percent rehabilitated. It's does he have the capacity to change. And so even if you accept that despite Mr. Briones saying it's probably my fault when I think about it and this death haunts me and it's what has pointed me toward Christianity, even if those things don't amount to taking responsibility, even if not taking responsibility somehow trumps the feelings of remorse and the fact that he's been a model inmate without a write-up, a single write-up in 20 years of incarceration, not even for failing to make his bed or having a pen when he wasn't supposed to, even if those things were true, at the very least we can see from this record that Mr. Briones is capable of change. And that's the kind of person for whom the Supreme Court puts life without parole off limits. Ginsburg. Is that a legal question or a factual question? Saharsky. Your Honor, we — even if that is a factual question — Ginsburg. Which is it? Saharsky. Your Honor, we submit that it is best viewed as a factual question in this case because it's the kind of question that an expert can make a determination about. Ginsburg. So the district court would have to make a finding? Saharsky. Yes, Your Honor. Again, the district court, it's not a formal fact-finding requirement. The district court doesn't need to use those precise words, but the district court has to accurately identify this class of person. Ginsburg. So you're saying that the district court's fact-finding was clear error in this case? Saharsky. In this case, Your Honor, we submit that the district court didn't even make the appropriate factual finding. Ginsburg. So you're saying there's a procedural error and the district court should have made a specific factual finding? Saharsky. No, Your Honor. We believe that the category, the legal category that the district court was looking for was not the Eighth Amendment category. So that is, the district court made the legal error of not trying to identify the person. We've gone through the hallmarks of chain of youth that Miller identified fairly extensively. It didn't make the, it didn't use the words incorrigibility or irreparable corruption, but I thought I heard you say it wasn't necessary for the district court to use those words. Saharsky. That's correct. It's not necessary for the district court to use those words. However, we know from what the district court said that it wasn't looking at capacity to change and it wasn't looking for rarity. We know that because. I don't know if it asked the right question. Saharsky. That's correct. Exactly. The district court wasn't even asking the right question, and Montgomery says you don't only have to answer the correct question, you've got to answer it right. So even if the district court had tried to identify this individual, this court could still reverse if it got it wrong, if it was identifying someone who just wasn't permanently incorrigible. So he, the district court should have used the words capacity to change? I'm just, I'm trying to figure out what was missing from the district court's fact findings specifically and what specifically the arguments that were raised before the district court, how those relate. I mean, the mere, what you had quoted earlier was, were statements that life without parole was not appropriate for this individual. But I'm looking for the request that the district court make those specific fact findings and what are the specific fact findings that should be made. Saharsky. So again, Your Honor, our argument is not that there's something missing from the district court's colloquy. It's that what the district court says betrays that it's asking the wrong question. So when it says he has improved himself in prison and then doesn't give any reason to change. But he was considering capacity to change. That's what I look at that language, say, oh, the court is considering capacity to change, but determines that there's not enough to outweigh evidence that he hadn't changed, such as identifying lies that Briones makes even before the court. So implicitly rejects Briones' testimony that he wasn't a leader, that he didn't have anything to do with it. So I guess I'm still confused about what fact findings the district court failed to make and what specific fact findings we should ask the district court to make and whether magic words have to be used. So no, Your Honor, no magic words need to be used. Again, though. But there seems like there are magic words that are missing. So what is it? Which one is it? It's not that there are magic words that are missing. It's, again, that the district court's colloquy doesn't reveal that it's focused on capacity to change as the ultimate test. Now, as you explained, it's possible the district court could have made a credibility determination, could have said that these lies outweigh improvement, but that's not at all what the district court said. Sotomayor, he went through all of the hallmarks of youth and talks about one of them is circumstances of the homicide offense. Miller specifically relates to that, including the extent of his participation in the conduct, et cetera, and he goes through that. I mean, that's appropriate under Miller, correct? It is appropriate to go through that. As we explained, it's as Judge O'Scanlan explained, the test is not did they check the correct procedural boxes, but are they achieving the right substantive outcome? And again, here, because the district court does not seem to be focused on capacity to change as the defining factor, because the district court is not projecting forward, the forward-looking statements, as Judge O'Scanlan put it, are all in the colloquy about why life without parole is inappropriate, not about why life without parole is appropriate. Counsel, in the fourth subcategory under Miller, they talk about whether the offender might have been charged and convicted of a lesser offense, if not for incompetencies associated with youth. In this particular case, the prosecutor offered a 21-year sentence, a plea, which was turned down, I gather, because his father insisted that he not accept it. How do we analyze that offer by the State in our analysis of number four in this Miller list? So, Your Honor, to correctly characterize what happened, as far as we know, there's been no dispute about that. In this case, we don't submit that there is a hard and fast rule, but we do submit that that goes to both how horrible the crime really was, right, so the prosecution thought 20 years might be an appropriate sentence. Wait a minute, wait a minute. Not necessarily. The prosecutor could have made that offer for a lot of reasons. And I have the same question Judge Smith did. This is a heinous crime. Miller and Montgomery, those were heinous crimes to awful, truly awful crimes. That's correct. But there are a lot of reasons for making a plea offer. And I think that the question goes to all of that wrapped in, all in, you know, we look to rehabilitation and reaffirmation of societal goals and retribution, all of that. At that time, at the time of the original sentencing, the State had made its determination that 20 years would suffice to pack in all of those considerations, not just the seriousness of the crime. That's correct. What do we do with that? Should that be part of our analysis now? So we certainly submit that it should be part of your analysis now. Now, again, we don't think that there's some sort of bright line, like you have to give him 20 years because he might have taken that plea. We're talking about the district court. What should the district court do with that on remand? So the district court should consider that as part of the package of information about why Mr. Brionis was convicted of what he was and why he was not. But when was this 20-year offer made? Apologies, Your Honor. At the time of the trial. Was it made before the trial or in the middle of the trial? There was some dispute about that, as I recall. That's correct, Your Honor. So it was my understanding is that it was made before trial. But getting back to Judge Smith's question, we don't see in this record that the district court considered that one way or another. Should that matter? Should that be something that should be considered? What do we do with that? Anything? So, yes, Your Honor. We believe that the hallmarks of Miller should all be considered. Did the defendant bring that up to the district court? The defendant's, yes, I believe the defendant's sentencing memorandum mentions this fact. Now, the district court. The defendant mentions the prior plea agreement that was rejected. That's correct, Your Honor. And I can pull up for you on rebuttal a pin site for that proposition. I thought the main import of this, of the plea issue, was the demonstration that it was under the control of his father. But as to the merits of it, it seems to me to be very weak because, as this is my understanding, that before trial they had a much weaker case than they ultimately turned out to have. That's correct, because the two witnesses in that case. It's not really a measure of what the court, what the prosecutors thought of the case in the end. That's correct, Your Honor. So it's an indication of his immaturity. So that is, it's not that we are trying to assess what he might have done had he been an adult faced with this plea. Counsel, I don't understand why it's an indication of his immaturity. Couldn't it just be an indication that he thought he was going to get off? So, Your Honor, because the way that this played out was his father convinced him not to do it, it's a sign of yet another way in which he was under the sway of his father and older brother when these crimes were committed. And that's part of what Montgomery talks about for why we think juveniles are less culpable when they commit a crime. It's because they are. Counsel, he also, up here. Apologies. That's okay. It echoes. It's very hard. To what extent does it matter that your client was really just a few days shy of being of majority age? You know, if this crime had been, I think, three weeks later, we wouldn't be having this conversation at all. So how does that play into the analysis? So, Your Honor, the Supreme Court had before it, in Miller and Graham, a theory of the sliding scale. The older you are, the less protection the Eighth Amendment affords. And it rejected that in favor of a bright line. It said, before 18, only rare, permanently incorrigible. After 18, that was it. But you're asking us to have the district court consider other factors bearing on his level of immaturity, which sounds like a factual inquiry into his personal level of immaturity. And so I'm asking how that factors in also. So certainly, the district court might have an easier time making a finding of irretrievable depravity than if he had been 12 when all of this had happened. Now, again, we submit that the overall record, including the really remarkable transformation that occurred in the decades since his incarceration, make clear he's not permanently incorrigible. He's not among those rare offenders. But it's certainly the case that the district court can consider the age he was when he committed the crime as part of its assessment of whether or not he's transiently mature or permanently incorrigible. So, again, bright line at 18 in that you have to do this analysis, because after 18, someone could be sentenced to life, whether or not they're in this rare category. I assume that the government's going to get up and tell us, go through several instances at the time of the resentencing where the, where Bione's continued to essentially disagree with the presentence report as to some details. And they're going to say that that, because they've said it at some length, that that shows that he wasn't accepting responsibility. I mean, to what degree is the presentence report here binding as to his responsibility to accept, to admit that he admitted the crime? That's correct. Right. He was kept to responsibility for the crime. But he, as I understand it, continued to say this wasn't really a gang necessarily and things like that. Is that, does this matter at all? I mean, or, first of all, the district court didn't rely on any of that, is that right? That's correct. So should we just say that and stop? Or is there something that matters with regard to the degree to which he needs to accept responsibility for the details of what was in the presentence report regarding the crime? So I'll answer, and then I'd like to reserve the rest of my time for rebuttal. No, Your Honor, we don't think that there's any reason to think that quibbling with the details of the presentence report means he's failing to accept responsibility, particularly since he says it's probably my fault, this murder has haunted me. He's taking responsibility for what actually happened, whether or not he agrees with the precise details of how it played out. And, again, to the extent that any court could conclude that he, that quibbling with the details of the presentence report has some significance in terms of his level of rehabilitation, that speaks only to whether more time in prison is warranted or whether he should be let out tomorrow, not to the question of whether he's so irretrievably depraved that he could never be rehabilitated, which is the finding that would need to be made in order for life without parole to be appropriate. Thank you, counsel. I'd like to reserve. Thanks. Good morning, and may it please the court. My name is Chris O'Lanham. I'm an assistant United States attorney from Phoenix, and I'm representing the United States. The district court judge that resentenced Riley Briones, Jr. was fully aware of Miller's substantive and procedural requirements. Counsel for both sides briefed and argued the Miller principles. The judge listened to and accounted for Briones' testimony and argument about his difficult upbringing and his youth. The district court judge also considered and unobjected to PSR, the prosecutor's allocution, and the prior sentencing transcript, which all detailed Briones' participation in, three weeks before he turned 18, the cold-blooded, gang-related murder of a subway clerk. Those sources also detailed how Briones' leadership role in the crime spree terrorized the Salt River Indian Reservation and continued into his 20s. They included, both leading up to the night before he turned 18 and after he turned 18, two fire bombings, participation in two drive-by shootings, plans to kill investigating officers and escape from prison, and his attempted murder of his friend, who he believed to be a cooperating witness. The district judge — But he was — he was prosecuted and served — convicted and served his sentence for those crimes. He was, for the additional crimes. Right. So he — he was not prosecuted for the attempted murder of the cooperating witness, Norval Antone. But I will not disagree. He was prosecuted for the arson. And the government ultimately agreed at the resentencing that he should not be resentenced on those counts. But why aren't — isn't that what you're arguing, essentially? No. That's not what I'm arguing. I'm arguing that in looking at whether the crime reflected permanent incorrigibility, the district court was required to take into account the entire course of criminal conduct, including the criminal conduct that occurred after the age of 18. But that is taken into account, the crimes that you say shouldn't be taken into account. It's taking into account the fact that he continued to commit crimes after he was 18, which is evidence that goes to the question of whether the crimes reflected permanent incorrigibility. A lot of this seems to me to be fair game, but I don't know if it happened. In other words, there are a lot of arguments made by the State here, and to some extent, there's arguments made by the defense counsel as well, that I just don't know if — I don't know if the district court did this at all. If we look at what we — we have a very sparse sentencing record here, admittedly a heinous crime, truly a heinous crime. And I — and I, you know, interrupted opposing counsel to say, well, wait a minute. Miller was an awful crime. Montgomery was an awful crime. If we're talking about LWOP for a juvenile, it seems to me as a given, we're going to be talking about a really horrible crime. That's what these cases are. And yet the Supreme Court has told us it should be the rare case where this sentence is imposed. So we're left with that, and we're trying to do our best here. And so when you start with the — reminding us of the crime, I just want to assure you, I think we're very mindful of that. Thank you. Very mindful of that. But we've got Miller. We do have Miller and we have Montgomery, and the government certainly does not disagree that there are both substantive and procedural requirements in Miller that Montgomery — that Montgomery talked about. But the parties before the district court also talked about those requirements, and the district court judge said expressly — Wait a minute. Wait a minute. Wait a minute. Are you suggesting that the district court knew that Miller was retroactive at the time of the sentencing? Yes. Montgomery had been decided by the time of the resentencing. The second sentencing, not the first district court. We're talking about the second sentence. The do-over. Yes. Right? At that point, he knew that. But what we have is this very modest sentencing record. If we're talking about what the district court judge actually articulated, which really gets to how do we know he asked the right question? It's very troubling to me to figure out whether he's got that. He certainly emphasizes the heinousness of the crime, and I am not going to dispute that with you. It's just that it reinforces this backward-looking view to the heinousness of the crime as opposed to what do we know about him? What do we know about Briones? And I think that's what the Supreme Court has said we have to look at here. The district court judge also did talk about what he knew about Briones. He accounted for the testimony that Briones gave at the resentencing. He said that he was the district court judge explicitly said at ER 253 to 255 that he was taking into account the history of the troubled youth. And the prosecutor had argued, this is at ER 242, that the district court judge had to find that Briones was one of the rare juveniles for whom a life sentence was appropriate and argued that this was the rare juvenile for whom a life sentence was appropriate. But again, that's what the State said. We're trying to figure out what was the judge thinking? And that's what I'm really struggling with, so I just want to add anything I have to. I was just going to ask, there's a peculiarity about the timing of this. If someone who is 17 is convicted tomorrow, and the sentencing court will have to guess at what their future ability is to be rehabilitated. In this case, because we're looking backwards, we don't really have to guess as much. So how does that timing peculiarity play out? Because as I read what the judge was saying here, it was almost as if the judge was trying to go back to the time as if this were the original sentence, rather than sort of looking at the picture now. And I wonder what your response is to that. So a few things on that. I think Your Honor has two points here. First of all, and I think the point is well taken, that Montgomery, as it's written, is sort of contemplating sentencing proceedings going forward. And so we are in a strange position here, because Montgomery has in it sort of these not competing, but these two inquiries into both whether the crime reflects permanent incorrigibility, which really, at the point where a defendant is initially being sentenced, the crime is going to be much more prominent in the district court judge's analysis, obviously. But it also does contain the words capacity for change. So in this kind of Miller resentencing, the district court does have to take both into account, both the nature of the crime. It's not incorrect to look backwards. But the judge also does have to look at the defendant and sentence him as of the date of the resentencing. Because he had a 20-year track record at this point. So it's pretty tough when we talk about capable of change to deny that there was then a 20-year track record. And I think it's even more complicated than that, it seems to me. It's even more three-dimensional, because at the time he was Mr. Briones was compiling this track record. I don't think there's any reason to doubt the sincerity of his efforts. He thought he was never going to see the light of day again. And yet he got his GED. He maintained his relationship. He counseled other kids from the reservation not to follow his path and so forth. And so it gets to be — there's a lot packed into that Judge Graber's question, I think. There is a lot packed into Judge Graber's question. But oddly, more — a much stronger reason to think that he really sincerely had changed. Your Honor, you have to contrast, though, and the district court judge had to contrast that with his testimony at the resentencing hearing, which goes in the opposite direction, which suggests that he lacked the capacity for change, because 20 years later he was still denying responsibility for portions of the time that occurred. What he was denying was not anything — he was denying essentially facts asserted in the — a few facts asserted in the presentence report, not anything that was essential to the conviction. Is that right? The facts were not elements of the conviction that he was denying. At the same time, they were essential facts that were proven to the jury and that were contained — Well, there were facts that were — there were evidence in the case which the jury could have believed or not believed and still convicted him. He could have been convicted of felony murder whether or not he was the leader of the gang or he — he told the shooter to go shoot him, right? That is true, Your Honor. However, that doesn't give him a license to stand up at the resentencing and say whatever it is that he wants to say that minimizes responsibility and on which the district court may — But he accepted fully responsibility for the crime, the felony murder, i.e., he drove the car and it was foreseeable that this was going to happen. It happened. He said he was responsible for that. So what I have trouble with is why he needs to accept every fact in the PSR. Your Honor, first of all, his counsel could have objected to the PSR if he didn't agree with any of the facts that were contained in the PSR. And she did not object to the PSR. But even setting that aside, the district court made factual findings. I think the real problem in this case, counsel, is that this is a resentencing. So by the time the parties appeared before the court, there is a lot of history that demonstrates or at least gives rise to very compelling arguments that goes to capacity for change and that he did in fact change. Now, the government does have arguments like, oh, I think he's still minimizing the egregiousness of the crime. It's still there. So the parties sort of put it out there to the court. But it's unclear whether the court utilized the right framework, so to speak. With all of this information demonstrating capacity for change, what in the district court's very brief explanation tells us that the district court asked the right question and analyzed the capacity for change? The district court on remand, it's not unusual that we send cases back if we can't tell whether the district court really asked the right question or applied the right legal framework. So what in the district court's explanation tells us that he analyzed the capacity for change but thought that the nature of the crime is such that Mr. Barillona still falls within that rarest category of juveniles for whom an AWOP sentence is still appropriate? So I'll point to two places in the record that evidence what the district court was thinking about and what the district court was considering. And then I also want to come back to the question of the remedy in the case that Your Honor is talking about. First of all, the district judge said that explicitly that he considered the arguments of the parties. He considered Briones' testimony. And these exact factors were contained in the arguments of the parties. So this case looks much more like you're talking about ER-254. Where the district court said on line 18, having considered those things and all the evidence I've heard today, that generalized statement. I'm talking about ER-219 and ER-252 to 253. So ER-219 is where the district court goes through all of the different things that it's considered, and that contains the correct Miller standard. So this case then starts to look much more like Cardi or like Gasca-Ruiz, where the parties have placed the correct standard in front of the district court judge, and the court needs to look at what the district court judge goes through in sentencing to determine whether there's any indication that the district court was really applying the wrong rule. Kagan. And then there's this twist that Miller interjects for this very special kind of case, right? Absolutely. And the district court judge made that clear at ER-217 and 218 when he referred to calculating the guidelines only as a starting point. And it's clear from this Court's case law, from the Supreme Court's sentencing cases, that it would have been procedural error. Sotomayor, except that's always true. The guidelines are always a starting point. Correct. That doesn't really say anything particular about Miller or understanding Miller. It just says I start with the guidelines. That's generic. Correct. And there's an easy way to harmonize this in terms of the procedure that a district court has to go through when it is making the determination to sentence someone to juvenile life without parole, and that is to calculate the guidelines, but then to do an analysis that's much more like the one in cases like Kimbra, where the guidelines don't reflect the applicable statutory or constitutional sentencing factors. Counsel, I want to change your focus for one second here. You brought the Malvo CERT grant to our attention. Why? We wanted the Court to know about it, obviously. We largely agree with the defendant's position here that it's unlikely that Malvo is going to affect the outcome of the case. That said, I think as Judge Berzon was pointing out, there is a remote possibility that perhaps they could talk about Malvo in the discretionary sentencing context. That said, I think it was Judge Graber who pointed out that the defendant in Malvo was seeking a remedy that the Fourth Circuit granted, and now that the Supreme Court has taken. And in this case, the defendant has already received that remedy. We agreed in this case. In other words, just to be clear that I'm following on Malvo, the question is whether this individual is entitled to be resentenced, not whether the resentencing was done correctly. Exactly. And we agreed in this case that it was initially a mandatory life sentence. And then coming back for the resentencing, again, the parties made it very clear to the district court at ER-241, SCR-41, that it was no longer a mandatory life sentence. And therefore, it was a discretionary life sentence at the time of the resentencing. Correct. Which is what Malvo is about. Correct. Which is why I get back to your point, Your Honor, that there is a remote possibility that if the Supreme Court determines that essentially portions of Miller weren't retroactive or reenunciates the standard in some way, that it could affect the outcome of the case. That said, it is a remote possibility, and those aren't the questions that really are squarely presented in the Malvo cert petition. I guess the question is, is there any reason not to wait? From the government's perspective, we'll agree with the defense here also. It's really up to the court in terms of its docket management. I don't see a reason not to wait, but that really would be up to the court. You pointed, counsel, to portions of the transcript where the court made generalized statements about considering all the parties' evidence, but you said you wanted to address the remedy. Yes. I did want to address the remedy. And obviously, in the supplemental briefing request in this case and in the briefing of amici that were pending at the time that this Court was considering whether to grant the petition for rehearing en banc, it appears that defendant may now be seeking all kinds of things that were outside the scope of the initial 2255 petition. The correct remedy, if this Court finds that the district court's statement of sentence is insufficient, which it was not, again, Montgomery says that there is no explicit fact-finding requirement, and we agree that there are no magic words that the district court has to say. But if the court disagrees with us on that point, the correct remedy is to send it back to the district court for further explanation, not to sort of go beyond and vacate his conviction or anything along those lines. I mean, the clearest key or problem to me about the way the district court proceeded was in the very beginning. Well, in mitigation, I consider the history of the abuse of father. And as I understand the argument on the other side is that that's backwards. Your Honor, respectfully, that is not backwards. But the Supreme Court did say it's the rare case where they should go forward with a juvenile. So why is it backwards? It did. But in Miller, at page 489, it also said this evidence is going to be in mitigation. It referred to it as mitigating evidence. In Montgomery, at page 726, it made the same finding. It called it mitigation evidence. The defendant, in appearing before the district court at SER 2 and SER 11 and in the initial 2255 petition, described the evidence that he wanted to present to the court as mitigation evidence. So where a defendant has described it that way and the Supreme Court has described it that way, there is no error for the district court to have described it that way. But it's different. And I certainly agree that the way the sentence structure, it almost gets to be semantics in a way. You know, to say mitigating evidence means that that cuts in my favor, you know, one way or another. I think it can be read in that context. But if you look at the sentencing remarks as a whole, it seems to me that the starting place was such that he never got around to the, right, the beginning. At the top of the decision tree, he did what Judge Berzon is suggesting. I don't think that's right, Your Honor. And, you know, it gets back to what I will agree is a brief statement. But where does he really embrace this notion of why is this the exceptional case? Why is this the rare case? That's what's so missing here. I think several of us have queried. Where can we see that the judge asked the right question? What's your strongest? Where do you want us to look? So I'll point you towards ER 253 to 255, which really are the meat of the sentencing – the meat of the sentencing pronouncement in this case, where the district court does go through the Miller factors and say that he's considered them. He talks about the defendant's immaturity. He talks about the youth. And there is no indication from anywhere else in the sentencing transcript either that the judge was using the guidelines as an anchoring point and improperly starting from a position of life. And then he goes on to consider the nature of the crime, which, again, in Miller and Montgomery is a relevant factor. Well, except that I would – you say he talked about it. There are four lines of transcript where he lists off abusive father, youth, immaturity, adolescent brain, and then about two pages about the crime with one line thrown in, you know, Buddy has improved himself while he's in prison. And I guess it just seems like a pretty skimpy analysis. I wouldn't refer to it as skimpy. It is brief, Your Honor, I will say. But the question at base is whether the district court set forth enough to show that he considered the party's arguments and had a reasoned basis for exercising his own decision-making authority. Counsel, where does – excuse me. This is my second question. I'd like to have it answered. Where in your – in the colloquy does the district court evidence any understanding about how rare it is that an LBOP sentence should be imposed on someone, on a juvenile who had committed even a heinous crime? The district court judge does not make an explicit statement, and Montgomery makes very clear that he was not required to use magic words or make an explicit statement. That is given. We all know that. Okay? A lot of this stuff is basic. Start with the guidelines, no express words. Okay? We're way beyond that at this point. But where do you see some thought or some evidence, which is what I'm looking for, that this district court judge understood when you start with rare, this is the rarest form of sentence, even if you use language in mitigation, where does it show he had an understanding that it would be a rare thing, an exceptional thing, to give a juvenile an LBOP sentence? So, Your Honor, and I apologize because I think in saying that this looks very much like a normal sentencing in that the parties provided that standard to the district court, the district court judge said that he had read that briefing and had considered that briefing and was taking it into account. Combine that with the fact that Montgomery does not contain an explicit fact-finding requirement, and you have the district court having applied the correct standard in this case because there's no indication that it applied a standard that was incorrect. Can you point to any words in the transcript other than, oh, I read everything? I mean, every district court judge starts with, I've read everything, to cover the bases, right? Your Honor, I'm afraid that this is circular because I'm going to keep on coming back to the same page in the transcript. The district court judge said that he had read everything. Okay. And that briefing contained the right standard. That's what you're relying on. You said you were going to talk about the remedy, and it would be helpful to me if you did. So I believe that I had answered Judge Nguyen's question in terms of if this court disagrees with us, that procedurally the district court didn't do enough to talk about the fact that it was applying the Miller factors, then the remedy would be to But for that very reason, I mean, it's a little hard to know why you, why we just shouldn't do that or why you care that much about it. If you're persuaded that the district judge applied the right standard, then we'll go back and he'll say, I applied the right standard, and this is why I think that's right. Well, the case will be done. So it's a little strange for 11 of us to be sitting here trying to read the judge's That's correct, Your Honor. And we have the same interest in this case that we have in any other case where district courts don't always make perfect, extensive records. This district court judge held an extensive sentencing hearing, an extensive resentencing hearing, where the only thing that was coming before that district court judge, and he knew it, was to apply the Miller factors. That was the entire reason that the parties were there. And so, given that we don't expect perfect records from district court judges and that Montgomery also does not contain an explicit fact-finding requirement. Counsel, can I ask you about that? You've said that repeatedly. As I understand Montgomery, the reason the Supreme Court didn't require that is because it was a state conviction. Here we have a federal conviction. The same principles of federalism aren't at play. And I'm wondering if we need to extend Montgomery in a way to require a fact-finding here where the federal procedure is at issue. I don't think so. And, Your Honor, I would respectfully disagree. Obviously, those cases arose in the state court context. But Montgomery did use very broad language that applies to the district court. Well, but then, too, you're right. I know the quote that you're referencing, but then it spends the next two paragraphs explaining why it's made that statement. And it's because of principles of federalism. They're not going to force states to adopt a certain procedure. That doesn't seem to be at play here. I agree. It's not directly addressed by the Supreme Court decision in Montgomery. But I'm wondering why we wouldn't go a little further. So, in federal sentencing cases generally, there aren't this type of explicit fact-finding requirement. The whole problem, this is a constitutional case, number one, and a constitutional standard. And, B, there is this weird interaction between the Montgomery standard and the guidelines standard. And the guidelines, the usual guidelines approach, which could well justify a different degree of meticulousness. Obviously, this Court takes its cues from the Supreme Court and has to read the Supreme Court's language and the reasons for the Supreme Court's decision. The reasons that the Supreme Court gave in Montgomery for not requiring an explicit fact-finding requirement are the same kinds of reasons that it has given for abusive discretion review in sentencing cases more generally in the federal context. So, we believe that those principles apply equally in a federal sentencing context. And this Court has to take its cues from the language of the Supreme Court. One more follow-up question. The panel, the majority, found plain error review appropriate. I have not seen or read the government defending that position. Is it fair to say you agree that the abusive standard is the appropriate review? So, as to procedural error, we believe that plain error is the correct standard of review as to procedural error. We did not raise that in our answering brief. We didn't read the opening brief as raising a procedural error question. If we had read the opening brief as raising a procedural error question, we would have advocated for plain error review there. Under cases like — sorry, I apologize. Under cases like Valencia-Barragan and Kleinman, it's pretty clear that this defendant was given an opportunity at the end of sentencing to make any objections to the district court's pronouncement of sentence at ER-256, and he didn't take that opportunity. So, as to procedural error, plain error is the correct standard to apply. So, isn't Montgomery a substantive rule? So, that was what I was going to get to, which was abusive discretion is the correct standard to apply to the question of whether the district court correctly applied the Montgomery and Miller factors. I'm sure about that. I understand abusive discretion is correct with respect to sentencing, but with respect to the substantive conclusion of the law, wouldn't that be more de novo? So, as to whether a given sentence violates the Eighth Amendment, that is typically a de novo question. That wasn't the standard of review that the defendant requested in his opening brief. He suggested that it was de novo review because it was a mixed question of fact and law, which is exactly what Gasca-Ruiz got to in the sentencing context in saying that if the district court judge is making — is applying facts to a clear rule, that's abusive discretion review. All right. So, this leads to a question that I just want to throw out there. Probably no one else would agree with me on this. But I'm just toying with the notion that there is enough in this record where whatever standard you apply, the district court erred, abuses discretion in both concluding that he's a model inmate and making some of the other findings he made and concluding that there was no capacity to change, if we're going to put that on there. Because he has changed. He has improved. He's been a perfect citizen while in prison. So, isn't that clearly in the record undisputed? Why shouldn't we say the court erred as a matter of law? Why did we remand it all? Because, basically, we're telling him, we think you erred if we remand. If we follow what Judge O'Scanlan said and we remand, we're really telling the district court judge, no, you need to make a contrary finding here on this record. So, obviously, I'm not sure how the court is going to write an opinion or in what way an opinion would come out or what an opinion would say. But abusive discretion review looks at whether there are inferences in the record that support the district court judge's discretionary determination, and in this case there are. The question of capacity for change, looking at it just purely from that capacity for change question, is the evidence on that is mixed. He made these statements at the sentencing hearing that could be taken as lies under oath at the resentencing hearing 20 years after he committed the crime. You have the fact that the crime extended into his 20s. The plea offer that he rejected — Crime didn't extend into his 20s. It was different crimes. It was different crimes committed all as part of the same course of conduct and by the same motivation, which was his loyalty to and leadership of the gang. That's not the crime of conviction.  of conviction. Aren't those factors relevant to whether he can be rehabilitated? I mean, I don't understand the big debate about this. Absolutely. I keep on getting back to that because those are relevant to the question of whether he can be rehabilitated. The fact that he continued to commit crimes as an adult is absolutely relevant to the question of capacity for change. I'll grant you that. It's just that we can't tell what the district court was thinking about that. That's all. And, Your Honor, I understand that. I also did — oh, I see I'm about to run out of time. I won't go into the plea agreement. All right. Thank you, counsel. Thank you. We would ask that you affirm. Your Honors, I would like to just address five quick points that came up in opposing counsel's colloquy. So, first, Judge Acuda, the two sites you are looking for at ER 186, there's testimony about the plea agreement. And at ER 229, counsel uses it — And was that in connection with the pressure from the father, so that particular hallmark? Yes, and then at ER — And not about his — the severity of the offense or whatever, capacity to change. It was solely in connection with the pressure from the father. That's right. And then at ER 229, counsel reiterates that as part of her sentencing colloquy. Okay. Thank you. Of course. I wanted to respond to opposing counsel's notation that the district court said that the guidelines were just a starting point. As some of you noted, that's sort of a form recitation. And we know that the guidelines influence the rest of the proceeding, not just from the language about mitigation, but also because when counsel objects at ER 218 to calculating the guidelines, the district court says, you will have a chance to argue whether we should vary downward. So again, really strong evidence that the presumption is backwards. Third, I wanted to respond to counsel's statement that statements in the record could be construed as minimizing the seriousness of the crime. Even the prosecution admits, that's at ER 242, that Mr. Brionis is genuinely remorseful. And Mr. Brionis uses language like, this haunts me. My greatest foundation in my life is to try to prepare myself to die for good because I have the blood of someone on my hands. Grief, regret, sorrow, pain, suffering. And when he reads his letter, you can see that far from minimizing the severity of the offense, it's really provided direction to his life. And he's really apologetic and really remorseful for what happened and doesn't know if he can ever live it down. Counsel, can I ask a question before you? Of course. I know you want to hit a couple other points. But this idea that we would take this on without remanding it to the district court, that seems to me to be an extraordinary remedy. Do you have any cases where we've done that, where we've taken on an abuse of discretion standard and said, we're not going to remand this back to the district court, we're just going to decide it on our own? That seems an extreme ursipation of our own authority as a court. Certainly, Your Honor. So I want to push back on the premise that abuse of discretion is the appropriate standard of review here. So where the district court does not have discretion to sentence, in an ordinary guidelines case, the district court has discretion to sentence within the guidelines above or below. Here, the district court only has discretion to sentence to life if this is a rare, permanently incorrigible offender. I thought you said that was a fact question in response to my question earlier. That's a question of fact. So the question is, can we make that question of – answer that question of fact on our own? Certainly, Your Honor. If there's just insufficient evidence in the record from which any reasonable decisionmaker could conclude that Mr. Briones has no capacity to change, and as Judge Wardlaw explained – Is that your position, that there's no evidence in the record from which a reasonable decisionmaker could decide he lacks the – he's not in that rare category of youth? Is that your position? Yes, Your Honor. Now, we also submit that a decisionmaker in this case did not, in fact, make that finding, but it is certainly the case where even the prosecution said he has come a long way since the time of the crime. It would seem, as Judge Wardlaw explained, impossible to conclude that he has no capacity to change. That – I want to return to the standard of review here just because, again, Cardi, Gaspar Ruiz, all this Court's cases coming after Rita and Gall are statutory interpretation questions about what's the appropriate way to assess claims under 18 U.S.C. 3553. And, again, this is a constitutional claim. It falls outside of that bucket. And then, finally, in closing, I just wanted to remind this Court of our outstanding request for supplemental briefing on – to more fully air the Cora Montgomery issue and to provide the panel information on two arguments raised by amici. Thank you for your time. Thank you, counsel. Thank you both for your arguments. The case is argued to be submitted for decision, and we'll be in recess. All rise. Hear ye, hear ye. All persons having had recess to which the Honorable United States Court of Appeals for the Ninth Circuit will now depart. For this Court, for this session, the House stands adjourned.
judges: Thomas, McKeown, Wardlaw, Graber, Berzon, M. Smith, Ikuta, Christen, Nguyen, Bennett, Nelson